# In re The LANDING ASSOCIATES, LTD., Debtor.

## Bankruptcy No. 90–51358–C.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

July 19, 1993.

794

Stephen W. Sather, Overstreet, Winn & Edwards, Austin, TX, for debtor.

Clinton L. Franklin, Susan C. Mathews, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Houston, TX, for Bank United FSB f/k/a United Sav. Ass'n of Texas FSB.

## DECISION ON CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION DATED DECEMBER 23, 1992, AS MODIFIED, AND ON MOTION TO DESIGNATE VOTE OF UNITED SAVINGS ASSOCIATION OF TEXAS UNDER § 1126(e)

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing Debtor's Plan of Reorganization Dated December 23, 1992, as Modified, and Motion to Designate Vote of United Savings Association of Texas under § 1126(e). The following decision constitutes the court's findings of fact and conclusions of law on both matters.

### JURISDICTION

This court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and may enter a final order with respect thereto pursuant to 28 U.S.C. § 157(c)(2). This matter is a core proceeding. 28 U.S.C. § 157(b)(2)(L).

### FACTUAL BACKGROUND

On August 1, 1983, The Landing Associates, Ltd., a Utah-based limited partnership ("Debtor"), was formed for the purpose of purchasing and operating a San Antonio apartment house known as The Landing Apartments ("Apartments"). The Debtor's original general partners were Clark Financial Corporation ("CFC") and S. Spence Clark ("Clark"). In April 1992, Mountain Western Management Corporation, a wholly owned subsidiary of CFC, was added as a third general partner.

The Apartments were purchased from The Landing Apartments, A Texas Joint Venture, for $6,080,000. Included in the purchase price was the remaining balance of $4,880,000 owed to United Savings Association of Texas, Houston Texas ("USAT"), the underlying mortgage holder. In the first two years of operation, the Debtor made and completed its payments to the Joint Venture; thereafter, the Debtor made the underlying mortgage payments directly to USAT.

The Apartments consist of a 216 unit complex, comprised of several three-story buildings, including a clubhouse and office, and is located approximately seven (7) miles east of the central business district of San Antonio. The property is also just a few miles north of Fort Sam Houston, headquarters of the U.S. Fifth Army and a major training center for military medical personnel, a factor which strongly (and positively) affects the property's continuing cash flow prospects.

The apartment's recreational facilities include a swimming pool, game room, and a lounge area with a sun deck and barbecue area. The court has valued the real property at $4,650,000.00 and the personal property at $20,000, and the parties do not dispute this value for purposes of confirmation.[1]

In late 1988, the Debtor began experiencing difficulty in servicing the mortgage debt, and so began negotiating for a workout with USAT. However, before a workout could be achieved, USAT was closed by the Federal Savings and Loan Insurance Corporation ("FSLIC"). The closed institution was acquired by United Savings Association of Texas, FSB ("USAT–FSB"), in a "Southwest Plan" transaction, pursuant to the terms of an Acquisition Agreement be-

---

**1.** In addition to the property itself, USAT also has a continuing security interest in the rents which are accruing on the property. The debtor has been, for most of this case, depositing excess rents into an account (after operating expenses, paid per an agreed budget under various cash collateral orders). The combination of rents and property make USAT an oversecured creditor. Over the last year or so, at the court's direction, the debtor has been making monthly payments of excess cash collateral to USAT. No issue has been raised by the parties regarding how these funds are to be applied to USAT's debt. *See In re Birdneck Apartments Assoc., II, L.P.,* 156 B.R. 499 (Bankr.E.D.Va.1993).

tween USAT–FSB and FSLIC; the parties to the Acquisition Agreement also entered into an Assistance Agreement, under which USAT–FSB receives various incentives relative to the management and liquidation of certain assets, including the loan to debtor here.

USAT–FSB was unwilling to negotiate with the Debtor; finally, on May 2, 1989, on the eve of foreclosure, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code. The bankruptcy was originally filed in Utah, but was subsequently transferred to this court, upon USAT's request.[2]

On April 10, 1992, CFC and Clark themselves filed chapter 11 petitions in the District of Utah. On August 14, 1992, Alan V. Funk (the "Utah Trustee") was appointed the Chapter 11 Trustee for CFC and Clark. Subsequently the limited partners of the various partnerships operated by Clark and CFC (including the Landing Associates, Ltd.) lost confidence in CFC and Clark and decided to replace them with new general partners of their own choosing.

On September 17, 1992, the Bankruptcy Court for the District of Utah lifted the automatic stay in both the Clark and CFC bankruptcies to allow an entity known as the CFC Legal Defense Fund, Inc. (evidently composed of disgruntled limited partners) to solicit the rest of the limited partners to elect Montford Investors Recovery, Inc. ("MIRI")[3], as a substitute general partner for the various CFC and Clark partnerships, including the Landing Associates, Ltd.

On October 26, 1992, MIRI and the Utah Trustee entered into an agreement (the "Agreement") whereby MIRI was given an option to purchase the general partnership interests of Clark and CFC in 19 partnerships, including the Debtor. MIRI was also given an option to purchase certain limited partnership interests and debt interests (obligations owed by the partnerships to the general partners) held by CFC and Clark as well. The Agreement was approved by the Utah bankruptcy court on October 27, 1992. Included in the package was the general partnership interest in The Landing, Ltd.

As of this hearing, MIRI has not exercised the option to purchase the partnership interests or any of the debt interests. In order to exercise the option to purchase a partnership interest, MIRI must pay the Utah Trustee $100,000.00 per partnership. On or about November 5, 1992, MIRI paid a nonrefundable deposit of $300,000.00 to the Utah Trustee. MIRI also has escrowed an additional $300,000.00 to secure its performance under the Agreement. Once MIRI has paid a total of $1,400,000.00, it will be allowed to acquire all of the general partnership interests, limited partnership interests and debt interests held by CFC and Clark.[4] MIRI will not proceed to perform on these agreements with respect to the Landing until it has obtained an order of confirmation from this court in this case.

Pursuant to the partnership agreement, the limited partners of the Debtor voted and elected MIRI as the Landing's general

---

**2.** Since then, USAT–FSB had undergone yet another name change, and is now known as Bank United of Texas, FSB (hereinafter "Bank United").

**3.** MIRI is a new corporation formed for the purpose of acquiring the CFC and Clark partnership and debt interests. MIRI's financial contributions to the partnerships are not based upon its own assets, but rather on its general partners' ability to raise funds from third parties. MIRI has arranged a group of investors who have agreed to advance funds to exercise certain option payments (discussed *infra*) to the bankruptcy estates of Clark and CFC (in order to acquire from those estates general partnership interests in various limited partnerships, includ-

ing The Landing), to raise the necessary capital for confirming plans of reorganization in limited partnership bankruptcies, and to raise capital for refinancing the debt on properties. The investor group is led by Wertheim Shroder & Co. ("Wertheim Shroder"), an investment banking firm located in New York City.

**4.** As of the date of this hearing, Wertheim Shroder has advanced $600,000.00 for the payment to the Utah Trustee under the option agreement, and has agreed to fund up to $10,000.000.00 for the purpose of recapitalizing the Clark and CFC partnerships. The investor group has also advanced over $40,000.00 for the purpose of funding an escrow for excess cash collateral expenses in this case.

partner.[5] MIRI assumed its responsibilities as general partner of the Debtor on November 4, 1992. Even though MIRI has not yet exercised its option to purchase the Clark and CFC general partnership interests in the Debtor from the Utah Trustee, as a result of the vote, MIRI now has the right to manage the Debtor and serve as general partner, which means that it is liable for all pre-existing obligations of the Debtor to the extent of partnership property, and personally for future obligations of the Debtor. *See* discussion *supra* at note 5; *see also* UTAH CODE ANN., §§ 48–1–14, 48–2a–403(2) (Michie Supp.1993).

On December 23, 1992, this court approved the Debtor's Disclosure Statement for the Plan of Reorganization Dated December 23, 1992; Debtor now seeks confirmation of its Plan of Reorganization Dated December 23, 1992, as Modified (the "Plan"). There are no competing plans.

The Debtor's Plan creates the following five (5) classes of claimants:

(1) Class I includes the administrative claims (including attorney's and accountant's fees); these claims are to be paid in cash upon either the Effective Date of the Plan or approval by the court. Class I is not impaired.

(2) Class II consists of the administrative claims, if any, of PMS, Inc. and Clark Financial Management Group[6]; no administrative claims have been filed by these entities yet, and the Debtor indicates that it will object if such claims are filed; if such claims are allowed, they shall be paid in sixty (60) equal monthly installments of principal, or if the Class II creditors object to this treatment, they will be paid in cash on the Effective Date of the Plan or when allowed by the court, whichever is later. Class II is not impaired.

(3) Class III consists of the administrative claim of Bank United, if any, for the Debtor's 1992 expenditures exceeding the cash collateral budget authorized by this court; MIRI has deposited $40,000.00 in an escrow account to cover any excess expenditures, and the claim will be paid in cash on the Effective Date of the Plan. Class III is not impaired.

(4) Class IV consists of all *ad valorem* taxes against the property, which are to be paid in full on the Effective Date or on the last date payable without penalty under state law. By the end of 1992, the Debtor

---

5. Utah, like most states, has adopted the Uniform Limited Partnership Act. That Act defines a general partner as "a person who has been admitted to a limited partnership as a general partner in accordance with the partnership agreement and named in the certificate of limited partnership as a general partner." UTAH CODE ANN. § 48–2a–101(6) (Michie Supp. 1993). Further, the Act provides that "additional general partners may be admitted as provided in writing in the partnership agreement or, if the partnership agreement does not provide in writing for the admission of additional general partners, with the written consent of all partners." *Id.*, § 48–2a–401. General partners may be removed and replaced. *Id.*, § 48–2a–402(3). And the partnership agreement "may grant to all or certain identified general partners the right to vote, on a per capita *or any other basis,* separately or with all or any class of the limited partners, on any matter." *Id.*, § 48–2a–405. Nothing in the statute itself requires that a general partner actually own any interest in the partnership as a prerequisite. Indeed, "a general partner ... *may* make contributions to the partnership ...", *Id.*, § 48–2a–404, but there is nothing in the statute itself that expresses requires such a contribution as a precondition to the status.

6. According to CFC's records, PMS, Inc. claims to be owed $201,847.88 and CFC Management Group is owed $51,006.56, ostensibly for "advances" made to the debtor during this case. The Debtor contends that it has valid objections to the majority of these amounts. For example, the Debtor notes that some $67,000 of the alleged PMS claim and $2,750 of the CFC Management claim consist of amounts advanced to the Debtor to retain professionals, yet neither of these entities obtained any court authorization to lend these sums to the estate. These sums can fairly be characterized as payments by related entities with a vested interest in the reorganization, but not necessarily payments recoverable *from* that estate. Another $41,849.76 of PMS' claim consists of so-called "supervisory expenses" above and beyond normal payroll. Not only were these sums not authorized to be paid as normal operating expenses under the cash collateral order but they would also, in all likelihood (according to the Debtor) not qualify as "reasonable and necessary expenses of administration" within the meaning of section 503(b)(1).

801

had escrowed $93,528.00 for the payment of these claims, and has continued to set aside monies in 1993. The Debtor seeks to pay these claims from Bank United's cash collateral pursuant to 11 U.S.C. § 506(c), but has escrowed the necessary funds to pay the claim in the event the § 506(c) action is disallowed. Class IV is not impaired.

(5) Class V consists of tenant security deposits; Class V claims will be paid in accordance with the terms of the leases in effect. Class V is not impaired.

(6) Class VI is the secured claim of Bank United, valued at approximately $4.67 million. The Debtor has requested that the court allow some deductions from cash collateral, discussed further *infra*. Bank United is to be paid whatever cash collateral remains on hand within 30 days of the effective date of the Plan.[7] The balance of the claim will then be paid over 120 months, in equal installments based on a thirty-year amortization, with a ten-year balloon. The interest rate is set at 8.5%, or such rate as the court, based on the evidence, determines is appropriate, up to a maximum of 11%. Assuming a principal amount of $4,670,000,[8] and an interest rate of 9.5% (the rate determined by this court *infra*), the monthly payments on the property would be $39,267.89. Based on the

same assumptions, the balloon payment will be $4,212,700.46, to be paid from the sale or refinance of the Apartments.[9] If the reorganized debtor cannot sell or refinance the Apartments, Bank United may then foreclose upon the Apartments. Class VI is impaired.

(7) Class VII is the unsecured trade debt, excluding any claims held by any Clark related entities, who are to be paid 100% of their claims in cash within sixty days after the Effective Date of the Plan. Class VII is impaired.

(8) Class VIII consist of the allowed unsecured claims of any Clark related entities, including CFC, PMS, Inc., CFC Pooled Investment Fund I, Ltd. and PMS Pooled Income.[10] Class VIII will be paid in cash, without interest, within 36 months after the Class VII creditors have been paid in full, but only to the extent the Debtor has excess cash flow over and above operating expenses and debt service. Class VIII is impaired.

(9) Class IX is the claims of the limited partners; the limited partners will retain their interests under the plan. Class IX is not impaired.

(10) Class X consists of the General Partner, MIRI, who have agreed to purchase the partnership interests of CFC and Clark

7. As earlier indicated, the parties do not dispute the value of the real estate at $4.65 million. There is, in addition, approximately $151,000 in cash collateral remaining on account. Since August 1992, the Debtor has paid over to Bank United another *$1,950,087.68* in cash collateral, at the direction of this court. None of this cash collateral was paid as adequate protection with regard to the real property. $44,473.48 per month was paid as adequate protection of the *cash collateral*, which this court had found in a previous decision to be separate and apart from (and in addition to) the real estate as an additional "package" of collateral. *The Landing Associates, Ltd.*, 122 B.R. 288, 296–97 (Bankr. W.D.Tex.1990). As of the date of confirmation, then, the bank's total collateral package is $6,751,094.88 (some of which, in the form of cash, has already been turned over to Bank United). This far exceeds its allowed claim, so that Bank United will also be entitled to recover its post-petition interest, reasonable attorneys' fees, and costs pursuant to section 506(b), through the date of confirmation. The court does not here determine what amount should be

allowed to Bank United under section 506(b), leaving that battle for another day.

8. This number assumes no additional reductions by virtue of an excess of cash collateral over the total of Bank United's claim, including the § 506(b) claim for interest, attorneys' fees and the like. To the extent there is a spread, the difference would be applied to reduce the Bank United's prepetition claim, thereby reducing the amount needing to be financed over the term of the plan, and reducing the debt service payments in the process.

9. The reorganized debtor, according to the Disclosure Statement, intends to look for a buyer for the property early rather than late in the ten year term of the debt service payments. *See* discussion *infra.*

10. Some of these claims have already been disallowed by previous orders of this court, on objections to the claims pursued by Bank United.

for $100,000. MIRI will retain its partnership interests in the Debtor. Class X is not impaired.

In connection with the confirmation hearing the Debtor filed a Motion to Designate the Ballot of Bank United under § 1126(e), claiming that Bank United cast its vote in bad faith. Bank United has itself objected to the confirmation of the Plan, on grounds that the Debtor, as the proponent of the Plan has not complied with the applicable provisions of Title 11 (§ 1129(a)(2)), that the Plan has not been proposed in good faith (§ 1129(a)(3)), that the Plan proposed management post-confirmation is not consistent with the interest of creditors (§ 1129(a)(5)), that the Plan does not meet the "best interests of the creditors" test (§ 1129(a)(7)), that the Plan lacks feasibility (§ 1129(a)(11)); and that the Plan discriminates unfairly and is not fair and equitable (§ 1129(b)).

The resolution of the § 1126(e) question is preliminary to confirmation, so the court will consider that issue first. Then Bank United's confirmation objections will be taken up.

## ANALYSIS

### I. *Ballot Designation under § 1126(e)*

■ Section 1126(e) of the Bankruptcy Code provides that "[o]n the request of a party in interest, and after notice and hearing, the court may designate any entity whose acceptance or rejection of [a] plan was not in good faith...." 11 U.S.C. § 1126(e). The term "good faith" as used in this section was intentionally left undefined, so that it might be defined and developed in accordance with cases as they arose. *See In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir.1988); *see also In re MacLeod Co., Inc.*, 63 B.R. 654 (Bankr. S.D.Ohio 1986) (citing 5 *Collier on Bankruptcy*, ¶ 1126.05[1] (1988)).

■ The United States Supreme Court discussed the standard for good faith under the predecessor statute to § 1126(e) in *Young v. Higbee Co.*, 324 U.S. 204, 210–11, 65 S.Ct. 594, 597–98, 89 L.Ed. 890 (1945) (construing Section 203 of the Bankruptcy Act, 11 U.S.C. (repealed) § 603). In *Young*, the Court stated that the good faith requirement was designed to eliminate those "obstructive tactics and holdup techniques" employed by some creditors to secure an unfair advantage through acceptance or rejection of the plan. *See Young v. Higbee Co.*, 324 U.S. at 212, n. 10, 65 S.Ct. at 598, n. 10.[11] Thus, one who casts a vote with the "ulterior purpose" of exacting for oneself an undue or unfair advantage can have that vote subjected to designation. *In re Gilbert*, 104 B.R. 206, 216 (Bankr.W.D.Mo.1989); *see also A.D.W., Inc.*, 90 B.R. 645, 649 (Bankr.D.N.J.1988); *In re MacLeod Co., Inc.*, 63 B.R. at 655.

■ Ulterior motives which can constitute bad faith include "pure malice, 'strikes', blackmail, and the [destruction of an entity] in order to advance the interests of a competing business." *See In re Federal Support Co.*, 859 F.2d at 19 (citing *In re Pine Hill Collieries, Co.*, 46 F.Supp. 669, 671 (E.D.Pa.1942)). "The history of this provision makes clear that it was intended to apply to those [creditors] whose selfish purpose was to obstruct a fair and

---

11. The *Young* Court noted that the Committee was intent on passing legislation to address the problematic result of *Texas Hotel Securities Corp. v. Waco Development Co.*, 87 F.2d 395 (5th Cir.1936), in which a creditor was allowed to vote claims purchased *solely* to prevent reorganization unless certain demands were met. *See Young v. Higbee Co.*, 324 U.S. at 212, n. 10, 65 S.Ct. at 598, n. 10 (citing HEARINGS ON THE REVISION OF THE BANKRUPTCY ACT BEFORE THE HOUSE COMMITTEE ON THE JUDICIARY OF THE HOUSE OF REPRESENTATIVES, H.R. 6439, SERIAL 9, , 75th Cong., 1st Sess. pp. 180–182). *Young* does not suggest that casting a vote for the purpose of blocking reorganization of itself constitutes bad faith; bad faith exists where there is an undue advantage to be gained through voting. *See id.; see also In re Marin Town Center*, 142 B.R. 374 (N.D.Cal. 1992) (vote not cast in bad faith simply because voted to block confirmation). In *Marin Town Center*, the creditor sought to block the plan of reorganization for legitimate business reasons; no undue advantage was gained, and the interest served was that of the creditor *qua-* creditor. *See id.; but cf. In re Applegate Properties Joint Venture*, 133 B.R. 827, 832 (Bankr.W.D.Tex. 1991) (purchasing claim for purpose of voting same to block plan may be grounds for disqualification of votes).

feasible reorganization in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt's assets." *In re Landau Boat Co.*, 8 B.R. 432, 434 (Bankr. W.D.Mo.1981) (quoting *Young v. Higbee Co.*, 324 U.S. 204, 210–11, 65 S.Ct. 594, 598, 89 L.Ed. 890 (1945)). Mere selfishness does not rise to the level of bad faith, however, and self-dealing and good faith are not mutually exclusive. *In re Frank Fehr Brewing Co.*, 268 F.2d 170, 180 (6th Cir.1959); *see also In re Gilbert*, 104 B.R. at 216 (citing *In re Featherworks Corp.*, 36 B.R. 460, 462 (E.D.N.Y.1984).

■■■ The Code does not require, nor could it reasonably expect, creditors to act with "selfless disinterest"; each creditor is expected to cast his vote "in accordance with his perception of his own self-interest." *See In re Federal Support Co.*, 859 F.2d at 19; *see also In re Gilbert*, 104 B.R. at 216. "If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass mustard [*sic*, muster]." *In re A.D.W., Inc.*, 90 B.R. 645, 651 (Bankr.D.N.J.1988). If a creditor sufficiently manifests a proper motive for the questioned activity, courts have been unwilling to second-guess the wisdom of the creditor's exercise of business judgment. *See id.* However, if the creditor fails to convince the court that the questioned activity was motivated by business judgment, then the court must inquire into the creditor's motives. *Id.* The standard is both inherently fact-intensive and difficult to apply, for what appears to be enlightened self-interest to a creditor may well appear to be an ulterior motive to the debtor.

■■■ In an attempt to brighten the line between ulterior motives and self-interest, some courts have analyzed the specific interest being benefitted by the questioned activity. *See In re P–R Holding Corp.*, 147 F.2d 895, 897 (2d Cir.1945); *see also In re MacLeod Co., Inc.*, 63 B.R. at 655 and *In re Featherworks Corp.*, 36 B.R. at 463 (both citing *P–R Holding Corp.* with approval). In *P–R Holding Corp.*, the court stated that "when the [questioned activity] is in aid of an interest other than an interest *as a creditor*, [it] may amount to bad faith...." *In re P–R Holding Corp.*, 147 F.2d at 897 (citing *Town of Belleair, Fla. v. Groves*, 132 F.2d 542, 543 (5th Cir.), *cert. denied*, 318 U.S. 769, 63 S.Ct. 762, 87 L.Ed. 1140 (1942)) (emphasis added). The mere pursuit of economic gain does not, of itself, indicate bad faith, so long as the interest being served is that of the creditor *as creditor*, as opposed to the creditor in some other capacity. *See id.* Under this approach, then, it is essential to examine the nature of the true interest being benefitted by the questioned activity.

In *Town of Belleair, Fla. v. Groves*, the Fifth Circuit made such an examination. *See Town of Belleair, Fla. v. Groves*, 132 F.2d at 543. In *Groves*, a plan of reorganization was denied confirmation on the grounds that "special inducements" had been used to secure the acceptance of the plan by a group of creditors who were also bondholders of the debtor corporation. *See Groves*, 132 F.2d 542–43. The court found that the creditor-bondholders had been principally motivated by the existence of the "special benefits" which benefitted their bondholder interests rather than their interests as creditors, and that such ulterior motives breached the requirement of good faith. *Id.* at 543. Under *Groves*, then, if the interest benefitted by the questioned activity is other than the creditor's interest, the activity may constitute bad faith sufficient to disqualify the vote.

In the instant case, Debtor suggests that Bank United was primarily motivated to vote against the proposed plan of reorganization by the desire to benefit from certain incentives in the Assistance Agreement between Bank United and FSLIC, and not so much by its interests as a creditor in this bankruptcy case. Debtor contends that, if Bank United is successful in blocking the Plan of Reorganization, it stands to make certain profits under the Assistance Agreement that would otherwise be unavailable; as a result, Debtor argues, Bank United is not acting out of its interests as "Bank United-creditor", but as "Bank United-party to the Assistance Agreement." The

Debtor points out that the Plan gives the creditor a performing loan at market interest with firm default provisions—very favorable treatment as plans go in cases like this. The Debtor has already paid Bank United nearly $2,000,000 in cash in the last eleven months, and stands ready to pay over the rest of the excess cash collateral thirty days after the Effective Date. Yet Bank United has spent nearly $500,000 in attorneys fees (all of which are recoverable from the federal government under the Assistance Agreement) to fight this plan, utilizing every conceivable theory to litigate virtually every objection to virtually everything the debtor has done or tried to do. Bank United counters that it has made an informed business decision in voting against the plan, wholly apart from the effects of the Assistance Agreement, and that it is entitled to zealously resist confirmation, regardless the lack of cost benefit.[12]

Under the Assistance Agreement, Bank United receives or may receive various incentives relative to the management of "covered assets." Covered assets include assets acquired by Bank United pursuant to the Acquisition Agreement between Bank United and FSLIC; the Apartments owned by Debtor are a covered asset under the Assistance Agreement. Assistance Agreement § 1(q)(7)(D).[13] If the institution continues to manage a covered asset that becomes non-performing, FSLIC,[14] under the Assistance Agreement, will make guaranteed yield payments to the institution, approximating the interest lost due to the non-performance. Assistance Agreement § 1(z), (aa), § 3(c)(1). FSLIC reimburses the institution for any FSLIC-approved write-downs on covered assets as well. Assistance Agreement §§ 4, 3(b)(12). If the institution elects to liquidate a covered asset, the Agreement allows the institution to participate in a "shared gain"; i.e., if the asset is liquidated for more than the adjusted book value of the asset during the applicable term, then the institution is entitled to keep ten percent (10%) of the profit, tax-free. Assistance Agreement §§ 1(oo), (3)(a)(8). Finally, the Assistance Agreement permits the institution to pass on to the FSLIC the costs associated with collecting a covered asset, including attorneys' fees incurred in a bankruptcy case such as this. Assistance Agreement, § 15(k).

The Agreement expires ten (10) years after the effective date, but certain incentives expire prior to that time.[15] The "applicable term" with respect to the type of covered assets represented by the Apartments ends at the end of the twenty-eighth (28th) quarter, or December 31, 1995. Assistance Agreement § 1(i). If Bank United is to realize any benefits under the Assistance Agreement in connection with its management of the Apartments, it must do so prior to December 31, 1995; if the institution elects (or is forced) to keep the asset beyond the expiration of the applicable term, the risk of management falls on the institution, and the incentives expire.[16]

**12.** It is not difficult to understand why Bank United has had no difficulties in spending virtually limitless amounts on attorney's fees to fight this plan. It gets to pass the bill on to the taxpayers under the Assistance Agreement—a fact which would hopefully shock the conscience of Congress should it ever have the opportunity to review the events surrounding this particular Assistance Agreement.

**13.** Specifically included in category IV covered assets are "completed five or more dwelling unit mortgage loan[s] or the property securing such loan[s]...." Assistance Agreement § 1(q)(7)(D).

**14.** The obligations of the FSLIC would presumably be discharged by some other agency, such as the FDIC, now that FIRREA has all but abolished that agency and subsumed many of

its functions under the Resolution Trust Corporation. *See* 12 U.S.C. § 1821(d). For purposes of this opinion, however, we will continue to refer to the governmental party to the Agreement as the FSLIC, the party named in the agreement.

**15.** The agreement may terminate earlier, if the acquiring association is placed into receivership or closed. Assistance Agreement § 24(a).

**16.** To date, Bank United (or its law firm) has already realized a substantial benefit, in the form of attorneys' fees approaching half a million dollars. As the creditor is fully secured, and the total amount of the loan is only a little over $5.2 million, it is difficult to understand how a reasonable creditor could have justified such an expenditure, especially in view of the

As noted previously, the Debtor's Plan provides for repayment of the Bank United debt over ten (10) years, based on a thirty (30) year amortization at a market rate, with a balloon payment at the end of the term. The balloon payment would not be due until the year 2003, at the earliest. The terms of the plan are not unusual for a single asset real estate case, especially in a market that has rebounded as much as has the market in San Antonio. The sheer amount of cash that has been paid to the bank during the term of the case—nearly $2 million—is highly unusual for a small, single-asset real estate case.

If this plan is confirmed, there will be no material change in the nature or availability of the guaranteed yield payments; in fact, Bank United could have voted *for* the Plan without placing itself in any worse position than could be obtained by blocking confirmation.[17] Under the Plan, the note to Bank United is to be restructured, with an interest rate of 9.5%. *See* discussion *infra.* It is possible that the amount of the monthly payment would change, but *the availability* of guaranteed yield payments would remain unaffected. Under the Assistance Agreement, the payments are only available to the extent that the asset is non-performing; to the extent that the asset performs, the payments are unavailable. If the asset performs, but the payment received by the institution is less than the guaranteed yield amount, the institution can still collect the remaining guaranteed yield payment. The fact that Debtor's

performance under the plan would prevent Bank United from foreclosing has no effect on the yield maintenance; the bank enjoys the net benefit of the guaranteed yield amount either way.

Debtor's performance under a confirmed plan *would* adversely affect Bank United's position regarding another aspect of the Assistance Agreement, the "shared gain" provision. In order to reap a shared gain, Bank United must foreclose on the property prior to December 31, 1995. If the Debtor is able to perform through that date, Bank United could not foreclose on the property before December 31, 1995, thereby costing Bank United its opportunity to participate in a shared gain. Bank United was and is aware of these considerations, although its representatives testified that no reference was made to the Assistance Agreement in rejecting the Plan.[18]

■■■ Because its vote had been guided *solely* by the fortunes bestowed on it under the Assistance Agreement, Bank United's vote had been designated by this court in connection with the Debtor's Fourth Amended Plan of Reorganization. However, a prior designation of a vote under 11 U.S.C. § 1126(e) does not foreclose a creditor's ability to have its vote counted under future plans. As with each plan, each vote cast by a creditor must be evaluated on its own merits, because, with each new plan, the circumstances surrounding the vote change. In addition, the mere

---

**17.** Theoretically, if the Debtor were to become unable to perform under the Plan, Bank United could elect to receive yield maintenance until the end of the applicable term, and foreclose on the property immediately thereafter, effectively wringing every cent possible out of the Assistance Agreement.

**18.** It is worth noting here that this is the *second* time the issue of bad faith voting has come up in this case, and Bank United has had the benefit of a "dry run" on presenting the evidence on the issue (including some insight into what the mind set of the judge might be). How the bank's witnesses testified was shaped at least in part by this learning experience, detracting somewhat from their credibility.

fact that Bank United has received nearly $2 million in cash within the last year from this debtor. If the real motive was to assure that no plan would be confirmed in this case over Bank United's objections, it would have been far less expensive for Bank United to have, years ago, simply purchased all the non-insider unsecured debt in this case, then simply not vote those claims. The debtor would have been left without the assenting class of creditors required by section 1129(a)(10), destroying the likelihood of confirmation and resulting in immediate relief from stay. *See Anderson Oaks Limited Partnership,* 77 B.R. 108, 111 (Bankr.W.D.Tex.1987). Bank United would have spent less than one-fifth what it has spent here. Only the law firm of Akin, Gump, Strauss, Hauer & Feld has benefitted by the strategy adopted by Bank United in this case.

passage of time means that the factual circumstances at the time of this plan may be (in this case, in fact, are) different from those surrounding the first plan.[19]

Several credit officers of Bank United testified regarding Bank United's credit policies and its specific reasons for rejecting this Plan.[20] The bank initially reacted negatively to the Debtor's attempt under the Plan to tax its cash collateral to pay third parties, including the Debtor's attorneys' fees and the taxing authorities.[21] Furthermore, the Plan provides for a payout to Bank United over ten (10) years, based on a thirty year amortization schedule, with a $4.2 million balloon payment due in year ten. The loan to value ratio under the plan is 1:1. While that ratio is common to the reorganization of debts in most bankruptcy plans, Bank United does not make loans where there is no equity in the collateral; in fact it usually requires a 1:1.4 loan to value ratio. Additionally, Bank United does not make ten (10) year loans with balloon payments; loans with balloon payments made by the bank rarely exceed two (2) year repayment periods—even restructured loans.

In addition, the extension of *this* particular loan to *this* debtor gave rise to legitimate concerns for Bank United. Testimony was offered that, despite its near-full occupancy, the Apartments now require structural maintenance, including specifically, new roofs and siding. These maintenance costs have been deferred,[22] and, according to the bank, the plan does not provide enough funds for future maintenance. In fact, if the roof required future replacement (in addition to the replacement currently planned) or if the pool needed major repairs, the bank contends that there would not be enough funds to accomplish such repairs. The bank questions whether the new owners of the apartment, after confirmation, would be sufficiently motivated to make such repairs, given that, in year ten (10) of the Plan, when the balloon comes due, the Debtor could simply allow Bank United to foreclose, leaving the bank with a dilapidated apartment complex, the value of which will nowhere near approximate the amount of the $4.1 million balloon.

Finally, Bank United was unimpressed with the creditworthiness of the Debtor and its new general partner, MIRI. Prior to this bankruptcy, the Debtor had defaulted on the obligation to Bank United in both 1978[23] and 1988. Furthermore, the bank was entirely unfamiliar with MIRI. MIRI itself had no credit history, as it was only formed in Fall, 1992. MIRI could not provide the bank with guaranties that MIRI could even raise the monies it promised to fund the Plan with. Hence, Bank United concluded that the Plan was not it its best interests and voted against it.

■ It has been said that courts should reserve vote disqualification for the votes of those creditors who are engaged in wrong-doing. *In re Allegheny Int'l., Inc.*, 118 B.R. 282, 293 (Bankr.W.D.Pa.1990).

---

**19.** This issue was in fact raised by motion by the debtor, and an order has been entered authorizing the bank to vote, notwithstanding its earlier disqualification, and permitting the court to evaluate anew the *bona fides* of that vote.

**20.** Despite the designation of Bank United's vote, the Debtor's Fourth Amended Plan of Reorganization was not confirmed because it failed to satisfy the "best interests of creditors" test under 11 U.S.C. § 1129(a)(7)(A)(ii). One creditor, with a claim of less than $300, had voted against the plan, and was receiving less than complete payment, even though the evidence indicated that, on liquidation, the general partner would be capable of paying all such recourse claims in full.

**21.** Under the Plan, however, the "taxing" under § 506(c) was not to be automatic. Rather, it was to be contingent on the court's ruling on the propriety of that request. Consequently, Bank United could have voted *for* the Plan and still *opposed* the attempt to tax its collateral under § 506(c).

**22.** The bank has resisted letting its cash collateral being used for anything more than emergency maintenance, so its complaint on this point is a bit self-serving, as its own conduct has at least in part contributed to the problem.

**23.** The 1978 default was actually one not by the Spence Clark partnership but by the predecessor joint venture that ultimately sold the complex to the Spence Clark group later. The two entities are unrelated.

This court believes that to be far too strict a test to make section 1126(e) serve as the useful tool it was intended to be. The entire bankruptcy process is permeated by equitable considerations, a fact which permits bankruptcy judges to interrupt the process at a variety of critical points when bad faith conduct is taking place. Most of the time, it is the *bona fides* of the debtor with whom we are concerned. *See In re Victory Construction, Inc.*, 9 B.R. 549, 556–57 (Bankr.C.D.Calif.1981); *see also* 11 U.S.C. §§ 707(a), 1112, 1307(c)(1), 362(d)(1) (relief from stay for cause), 1325(a)(3), 1129(a)(3). Section 1126(e) allows courts to turn their scrutiny on those creditors whose conduct tinges their participation in the equitable process with bad faith. At bottom, the nature of the inquiry is little different, and it requires the same caution as when it is applied to debtors. Painting with too broad a brush in this area can lead to excessive unpredictability in a system that functions best with a minimum of unpredictability from the judicial quarter. *See* M. MacDonald, M. MacDonald, Jr. & C. McLeod, Chapter 11 as a Dynamic Evolutionary Learning Process in a Market with Fuzzy Values, Norton Annual Survey of Bankruptcy Law (Clark Boardman Callaghan 1993), at 80 n. 70.

What makes the application of the test to creditor voting so very difficult is that so many creditors resent the bankruptcy process itself, and that resentment is often expressed in their voting. Merely expressing that distaste for the law by voting negatively on a plan would not seem by itself to be the sort of "bad faith" Congress had in mind when it put the disqualification provision into the bankruptcy laws.[24]

Too, what debtors think represents a "good deal" may not look so rosy from a creditor's point of view, and the voting process is expressly designed to give credi-tors the opportunity to express how the plan looks *to them*. The fact that a creditor may not know what is good for it, therefore, can again, of itself, not be grounds for disqualifying that creditor's vote.

On the other hand, a creditor does not have an unfettered right to submarine a plan to serve a motive at best tangentially related to its position as a creditor, a so-called "ulterior" motive. Certainly, even here, some care must be exercised, for in many cases, creditors act for a variety of motives, only some of which are directly related to their status as creditors. For example, trade creditors often vote in favor of plans not so much because the plan itself assures a fair repayment of their prepetition debt, but because it promises the survival of an entity with which to do future business. Yet few would argue that that sort of mixed motive is the sort of "ulterior" motive Congress intended to proscribe. *See John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Assoc.*, 987 F.2d 154, 23 B.C.D. 1537, 1541 (3d Cir.1993). Again, some secured creditors often have a "return on investment" concern that motivates them to favor immediate liquidation in lieu of reorganization, so that the investor's money tied up in the loan can be reinvested at more favorable rates (to minimize the loss on the spread, as it were). This too "infects" the motivations of the creditor, but again, should not, absent more, be held to so taint the vote as to require its disqualification.

But when the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and only incidentally related to the creditor's status *qua* creditor, section 1126(e) is rightly invoked. Thus, voting to block a plan in order to

---

**24.** By the same token, simply stating, in response to a § 1126(e) motion, "Oh, I hate all bankruptcy cases, so I always vote 'no'" ought not be a safe harbor either, else every creditor with a *real* ulterior motive will immediately hide behind this convenient reason. The process is, truly, highly fact-intensive, and so re-quires the same sort of close examination of demeanor, credibility, and surrounding circumstances that often accompany fraud trials. After all, no one is simply going to admit on the witness stand that, yes, they *did* vote against a plan out of an ulterior motive.

acquire the company ones' self justifiably results in disqualification, as it did in *Allegheny Int'l. Supra,* 118 B.R. at 293. So also ought efforts to put the company out of business in order to realize a competitive gain. It has even been held that using a negative vote in order to "hold up" the debtor for an improper gain may justify disqualifying a vote, though, again, it would seem that holding out for better plan treatment should not be the sort of gain a court should consider "improper." [25] Purely malicious or mean-spirited conduct, such as an attempt to simply destroy the debtor via obstreperous conduct culminating in a negative vote certainly ought to result in disqualification.

The facts in this case demonstrate an admixture of creditor-related and non-creditor-related motives. On the one hand, the bank's vote expresses its opinion of the bankruptcy process in general, and of its treatment in particular.

Were that the entire story of this case, the vote disqualification issue would not even have required a written decision. It is not the entire story, however. The sheer amount of attorneys' fees spent by the bank on this case demonstrates a complete *disregard* for the best interests of the creditor *qua* creditor, substantially diminishing the credibility of the bank's proffered reasons for voting against the plan. Indeed, the bank seems to be determined to destroy the debtor *at all costs* (literally), for it seems difficult to justify the amount of attorney's fees spent on the case on any other grounds.[26] And if indeed that *was* the intention of the bank, the court would have little difficulty finding that to be an improper motive.[27]

If this was *not* the motive of the bank, on the other hand, then some other justification for the bank's conduct must be emerge from this extraordinary collection of facts. And one does. The Assistance Agreement has introduced incentives into the process that appear to motivate Bank United's conduct, and in all likelihood, explain just why Bank United has fought so long and so hard to prevent confirmation of a plan in this case. In fact, given the facts

**25.** That, after all, is ostensibly one of the reasons for giving creditors a vote in the first place. Where it might be *improper* is when a creditor, knowing it holds a *swing* vote in a class with many members, votes against the plan in order to exact some benefit for itself, as opposed to a benefit for the class.

**26.** The bank contends that virtually every step it has taken has been either in response to an outrageous plan or a legitimate effort to enforce its rights under its loan documents and under the Bankruptcy Code. The court that has watched this case unfold, however, does not find these explanations persuasive. Often, the bank has spent thousands of dollars complaining about *de minimas* violations of the cash collateral order, for example. The bank even attempted to appeal the court's earlier order which *denied* confirmation of the debtor's earlier plan, lamely arguing that it was simply concerned about "law of the case" and collateral estoppel. The bank also maintained at that time that it wanted the district court to require the bankruptcy court to make findings on *all* the elements of section 1129, even though a failure to satisfy even one of those requirements is fatal to confirmation, rendering ruling on the remaining elements a waste of judicial resources. The bank *still* has on appeal this court's disqualification of its ballot from that earlier plan, even though denial of confirmation should have rendered that dispute moot. The bank has also routinely staffed this case with at least two attorneys at virtually every hearing (and there have been *many* hearings). Had the bank been motivated primarily by its interests as a creditor, it would, it seems, have avoided expending unnecessary attorneys' fees and would have pursued negotiation for better plan terms. Or the bank could have purchased all the unsecured claims against the estate, then not voted them. It has declined to pursue such routes, however. Instead, it has spent more attorneys' fees in a single asset real estate case of this size than this court has ever seen before. This is more than simply "reacting" to the debtor's moves.

**27.** If on the other hand, the primary reason for the extended fight (and the negative vote) was that there was no incentive to keep the costs down (because those costs were being passed on to the federal government under the Assistance Agreement), then the issue is more difficult to resolve. As reprehensible as such conduct is (ought not, after all, the bank and its law firm be as sensitive to costs as would be the RTC itself, were the RTC directly responsible for this case, given that the dollars involved come ultimately from the taxpayer?), so long as the fight and the negative vote spring from the bank's opposition as a creditor, it is more difficult to treat the motives of the bank in voting against the plan as *ulterior.*

of this case, the Assistance Agreement incentives offer the *only* sensible explanation for Bank United's conduct.[28]

The issue, then, is whether the bank's being motivated primarily by the incentives available to it under the Assistance Agreement renders its negative vote one cast in bad faith, for purposes of section 1126(e). The question is a close one, for in one sense, there is little doubt that the Assistance Agreement represents an "ulterior motive." On the other hand, the Assistance Agreement was, at least theoretically, designed to motivate the lender to administer assets in a way deemed consistent with federal policy, much as though the RTC or the FDIC were itself administering this asset. Indeed, Bank United's handling of this loan is supposed to be monitored by the FDIC via reports filed with that institution. If all this renders the bank's resulting conduct "ulterior" for purposes of the statute, then the same charge could be leveled at the RTC and the FDIC in *their* administration of the assets of failed institutions—a result this court, with some misgivings, nonetheless shrinks from.[29]

With more than a little reluctance, then, the court is compelled to reject the debtor's motion to disqualify the vote of Bank United in this case. If there is fault to be found here, it is with the Federal Savings and Loan Insurance Corporation that originated these assistance agreements in the first place. This case is but one example of the sort of mischief these agreements have fostered, and the sort of costs they have imposed on the American taxpayer. The court's deep disgust for the sort of conduct it has watched played out in this case on the part of Bank United and its attorneys is not grounds to disqualify the bank's vote under section 1126(e). *See In re Marin Town Center*, 142 B.R. 374, 379 (N.D.Cal. 1991) (vote not cast in bad faith where creditor rejected plan under belief that liquidation would be less injurious to creditor's interest than confirmation). It *is* cause enough to bring the entire matter to the attention of Congress, the body ultimately responsible for oversight of these assistance agreements.

## II. *Confirmation*

■■■ In order to confirm a plan of reorganization, a bankruptcy court must determine that all of the requirements of Section 1129(a) have been satisfied. 11 U.S.C. § 1129(a). One of those requirements *is* that all impaired classes accept the Plan. 11 U.S.C. § 1129(a)(8). In this case, Class 6, the impaired claim of Bank United, has rejected the Plan. Notwithstanding that rejection, a court may, upon request of the plan proponent, nonetheless confirm the plan under § 1129(b), the "cram down" provision, but only if all the other requirements of section 1129(a) are satisfied. A court may not rewrite any of the provisions of the plan, however, and if the plan does not satisfy the requirements of § 1129(a) and (b), confirmation is automatically denied.

---

**28.** This court has seen many single asset real estate cases, both as a judge and as a lawyer. Few involved a property as strong as this one. Because of the property's location, it enjoys very high occupancy (over 95%). It is, overall, in very good condition, having no more deferred maintenance than normal for a property such as this. The on-site property manager is excellent. The cash flow from the property is consistently positive, so much so in fact that the debtor has been able to pay the bank over $40,000 a month for the last eight or nine months and has delivered nearly $2 million in cash to the bank in that time. A new investor has already committed substantial funds *before* confirmation to maintain the debtor's operations. All parties agree that the lender is *over* secured. The debtor has no difficulty in proposing a market rate on the payout, and the term is not, in this court's experience, unusual. Even the notion of "pure malice" will not hold up on these facts, for virtually all the vitriolic reactions to the debtor were initially aimed at Spence Clark and his shenanigans. But the limited partners threw out Spence Clark and replaced him with an unrelated neutral entity with whom the bank has had no prior negative experiences. Yet the attacks have continued with virtually the same intensity.

**29.** Recall that earlier, we observed that private lenders whose motives might be influenced by the investors who put up the capital that is tied up in the loan could not reasonably be held to be voting in bad faith on those facts alone. *See* discussion *supra*. The motives of the bank here share many of the qualities of that sort of dynamic.

The debtor's representative testified under oath that the Plan satisfies all the requirements of § 1129(a), including specifically the requirement that it be feasible. In addition, the debtor offered evidence that the rate offered on the bank's treatment under the Plan was fair and equitable in that it yielded to the bank the present value of the allowed amount of its secured claim, given that a portion of that claim would be reduced immediately by the payment of cash collateral, and that the balance would be paid at a rate two and a half points over prime, or a rate set by the court up to eleven percent (11%). Bank United put on testimony to controvert this testimony, including that of an accountant who challenged the reasonableness of the discount rate employed on the long-term payout, and who observed that lending institutions are not making and would not make loans of this sort.

Bank United contends that the Plan cannot be confirmed, because the Plan proponent has not complied with Title 11 as required by § 1129(a)(2), the Plan has not been proposed in good faith as required by subsection (a)(3), the proposed management and future operation of the Debtor is not consistent with the interests of creditors pursuant to § 1129(a)(5), the Plan is not consistent with the best interests of creditors as required by § 1129(a)(7)(A)(ii), that the Plan is not feasible, as required by § 1129(a)(11), and that the Plan discriminates unfairly and is not fair and equitable, contrary to the requirements of § 1129(b). We address each of these objections below, and make specific findings on the remaining elements of § 1129(a) and (b), as required by the Code.

### a. § 1129(a)(2)

Section 1129(a)(2) provides that a court may only confirm a plan if "the proponent of the plan complies with the applicable provisions of this title." *Id.* Bank United argues that the Debtor, over the extended history of this case, has violated provisions of the Bankruptcy Code, and these violations, no matter how minor and regardless whether previously remedied, should be a "silver bullet" to kill this Plan. Specifically, Bank United points to the Debtor's maintenance of pre-petition bank accounts post-petition (and payment of pre-petition creditors therefrom),[30] and the use of cash collateral without authorization of the court or consent of Bank United.[31]

Certainly, serious violations of the Bankruptcy Code by a Debtor can and should result in a denial of confirmation of a plan under § 1129(a)(2); however, such a finding is not warranted here. Soon after filing its petition, the Debtor closed all pre-petition bank accounts.[32] In addition, the court ordered the Debtor to repay to Bank United any expenditures from cash collateral which were made in excess of the cash collateral budget authorized by this court. In fact, the court ordered MIRI, the Debtor's new general partner, to fund an escrow account with $40,000.00, and to audit the Debtor's expenditures in excess of the cash collateral budget, which it has done. Any expenditures made over the cash collateral budget were to be paid to Bank United from the escrow fund. MIRI has complied with the court's order. While it is clear that Bank United was wronged by the Debtor's unauthorized use of its cash collateral, that wrong has long since been righted.

Some courts have construed section 1129(a)(2) literally, denying confirmation for any violation of the Bankruptcy Code. *See, e.g., Matter of Cothran,* 45 B.R. 836, 838 (S.D.Ga.1984) (use of cash collateral in violation of § 363(c) prevents confirmation upon objection of creditor); *In re Midwestern Cos.,* 55 B.R. 856, 863 (Bankr.W.D.Mo. 1985) (plan not confirmed where debtor refused to pay court ordered administrative expenses). In fact, at least one court has held that a plan may not be confirmed where any infraction has occurred, regard-

---

**30.** A problem long since remedied.

**31.** Another problem long since remedied.

**32.** The post-petition payments to pre-petition creditors about which Bank United objects related to a small amount of money, consisting primarily of utility bills, received post-petition for periods which overlapped the Petition Date.

less of whether it has been cured or whether it was authorized by the court *nunc pro tunc. See In re Briscoe Enterprises*, Ltd. II, 138 B.R. 795, 809 (N.D.Tex.1992).

██ In the opinion of this court, such a slavish interpretation of § 1129(a)(2) can lead to draconian results not intended by Congress. When interpreting a statute, "[t]he judge should try to think his way as best he can into the minds of the enacting legislators and imagine how they would have wanted the statute to be applied to the case at bar." Posner, *Statutory Interpretation—In the Classroom and In the Courtroom*, 50 U.Chi.L.Rev. 800 (1983), *reprinted in*, 3 Sutherland Statutory Construction 483, 495 (1992). Contrary to Bank United's interpretation of § 1129(a), Congress did not intend to fashion a minefield out of the provisions of the Bankruptcy Code. In fact, the legislative history mentions the provision only in passing, offering as an example of compliance that the debtor meet · the disclosure requirements of § 1125 to satisfy § 1129(a)(2). *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess., p. 412 (1977). Certainly, if Congress had meant that *any* infraction, no matter how early on in the case, no matter how minor the breach, and regardless of whether the court has remedied the violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express. For example, Congress could have enacted a provision in § 363 which automatically lifts the stay or dismisses the case if a debtor used cash collateral without authorization, but it did not.[33] *Cf. Kane v. Johns–Manville Corp.*, 843 F.2d 636, 646 (2d Cir. 1988) (giving similar interpretation to companion provision § 1129(a)(1) that where Bankruptcy Code violations are so insub-

stantial that they constitute harmless error, they do not warrant overturning entire plan of reorganization).

██ Furthermore, even if the court were to rule that any violation of the Bankruptcy Code would result in the denial of confirmation, it would be inappropriate to apply that rule to these facts. All of the violations about which Bank United complains occurred when the Debtor was controlled by its old general partners, CFC and Clark. In October 1992, the court set strict limits on the Debtor's use of cash collateral. In November 1992, MIRI assumed the role of general partner. Since that time,· the Debtor has complied with the provisions of the Bankruptcy Code and the orders of this court. In light of the Debtor's conduct since MIRI has become the general partner, it would be inequitable to hold MIRI responsible for the sins of its predecessors.

The court concludes, therefore, that Bank United's objection that the Debtor has not complied with the provisions of the Bankruptcy Code under 11 U.S.C. § 1129(a)(2) lack merit and should be overruled.

### b. § 1129(a)(3)

██ Section 1129(a)(3) provides that a plan may be confirmed only if it has been proposed "in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Code does not define good faith in this context; in considering the good faith of a plan, the court's inquiry must include a consideration of all facts and circumstances surrounding the plan to determine if the plan will "fairly achieve a result consistent with the Bankruptcy Code." [34] *See In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir.1984); *see also Matter of Nikron, Inc.*, 27 B.R. 773,

---

**33.** Interestingly enough, Congress did enact provisions for a court to dismiss or convert a chapter 11 case where a debtor fails to comply with certain provisions of the Code. For example, a court may convert or dismiss a case where a debtor fails to propose a plan within any time fixed by the court, 11 U.S.C. § 1112(b)(4), and where a debtor fails to pay any fees or charges required under 28 U.S.C. § 123. 11 U.S.C. § 1112(b)(10). That section does not call for

dismissal of the case for violations of cash collateral orders, however.

**34.** The primary purpose of the reorganization chapter of the Code is to promote the restructuring of debt and the preservation of economic units. *See In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.S.D.Cal.1982).

778 (Bankr.E.D.Mich.1983). The Fifth Circuit has adopted a two-part standard for determining if a plan has been proposed in good faith; the plan must be proposed with a "legitimate and honest purpose to reorganize and [have] a reasonable hope of success." *In re Sun Country Development, Inc.*, 764 F.2d 406, 408 (5th Cir.1985).

### 1. Bad Faith Filing

■ Bank United suggests that the bankruptcy filing in this case was in bad faith, and that the Debtor's Plan cannot escape the taint of bad faith present from the inception of the case. Bank United relies on the legal standard established in several bad-faith filing cases for this proposition. *See, e.g., Matter of Little Creek Development Co.*, 779 F.2d 1068 (5th Cir. 1986); *In re Fry Road Assoc., Ltd.*, 66 B.R. 602 (Bankr.W.D.Tex.1986). However, a different legal standard is employed when evaluating good faith for plan confirmation purposes under § 1129(a)(3). *See In re Apple Tree Partners, L.P.*, 131 B.R. 380, 393 (Bankr.W.D.Tenn.1991). The inquiry focuses on examining the totality of the circumstances surrounding the *proposed plan*, in light of the underlying goal of the Code to encourage efforts at rehabilitation. *See Sun Country*, 764 F.2d at 408; *see also Public Finance Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir.1983).

■ We are long past deciding whether this case should be dismissed for bad faith filing (the issue before the court in *Little Creek*). This case was filed over four years ago in Utah, and has undergone venue transfer and extended cash collateral disputes in the interim. Bank United has not thus far moved to dismiss the case on the grounds it alleges in this objection to confirmation.[35] It is a little late to be raising the issue now, at this late date, on the eve of confirmation, more than four years after the case was filed. If there was any real merit to Bank United's contention, it would have sought immediate dismissal of the case, as did the movant in *Little Creek*. If the creditor were truly suffering the sort of abuse which the court in *Little Creek* says justifies immediate dismissal of a case (or relief from stay), then the creditor would have brought the matter to the immediate attention of the court so that its damage could be ameliorated. The failure to do so is a fairly strong indication that there is no merit to the contention, and that the entire issue now raised here is little more than a stalking horse.

■ Bank United also argues that the plan has not been proposed with the legitimate and honest intent to reorganize, but solely to save the equity holders from suffering the adverse tax consequences that would flow from foreclosure. However, the evidence does not prove that the Debtor is motivated solely by tax avoidance, to the exclusion of a legitimate purpose to reorganize. The fact that foreclosure would have tax consequences, and that the bankruptcy may have been filed in part to avoid those consequences, does not mean that the plan has been proposed for tax avoidance purposes—much less that the plan is filed in bad faith. *See Confederation Life Insurance Co. v. Beau Rivage, Ltd.*, 126 B.R. 632, 641 (N.D.Ga.1991). Debtors, like creditors, can have mixed motives, and should be no more penalized than are creditors. We have already adverted in this opinion to the mixed motives of Bank United. If the debtor's motives are mixed, it is no more fatal to this plan than were the mixed motives of Bank United to its vote.[36]

### 2. "Artificial" Impairment

■ Bank United also urges this court to find that Class VII, the unsecured trade debt, has been "artificially impaired" solely to satisfy the requirements of Section 1129(a)(10), and that this tactic constitutes

---

**35.** Bank United made a similar argument in the context of the Debtor's Fourth Amended Plan of Reorganization. That argument, for the same reasons cited here by the court, was also overruled.

**36.** Keep in mind that the touchstone in both section 1129(a)(3) and section 1126(e) is good faith. It is difficult to believe that the same term has one meaning when applied to debtors and another when applied to creditors.

bad faith sufficient to warrant denial of confirmation. The debtor responds that, even if the impairment were done "intentionally," that would not violate the good faith standard. In any event, the debtor points to independent business reasons for the its impairment of the trade debt (discussed *infra* ).

Section 1124 defines, but does not restrict, impairment. 11 U.S.C. § 1124. In *Sun Country Development,* a class had been established as unimpaired, but an amended plan then impaired this class. *Sun Country,* 764 F.2d at 408. The Fifth Circuit, applying section 1129(a)(3), determined that a change in the treatment of unsecured creditors (even to effectuate cramdown) did not go to either part of the two-part good faith test it there announced, i.e., that the plan represented a legitimate and honest attempt to reorganize and had a reasonable chance of succeeding. The debtor's treatment of the unsecured debt therefore had no effect as a matter of law on the good faith of the debtor for purposes of section 1129(a)(3). *Id.* at 408. The same rule of law applies in this case.

Bank United focuses on *dicta* in *Sun Country* to the effect that there must be independent grounds for impairment in order to withstand a good faith challenge, citing a decision by a prior judge of this court to that effect. *In re Meadow Glen, Ltd.,* 87 B.R. 421, 425 (Bankr.W.D.Tex. 1988). Bank United further maintains that no such independent grounds are present here. The debtor, apart from its factual contention to the contrary, adds that the *dicta* is not controlling and that reliance on *Meadow Glen* is misplaced.

In *Sun Country,* the district court, on appeal from the bankruptcy court's decision, conducted a *de novo* review regarding the circumstances surrounding the change in treatment of the trade class, concluding that the impairment was justified for independent reasons other than to create an impaired class; *in dicta,* the Fifth Circuit found that the change in treatment was necessary, further supporting its conclusion regarding the *bona fides* of the plan. *See id.* It did *not* rule that this finding

was essential to its holding, however, as Bank United here contends. If that finding was helpful or persuasive to the court, well and good. It nonetheless was not the holding of the court that such a determination was necessary in order for the debtor to withstand a good faith challenge. Nothing could be clearer than the words chosen by the court for its holding:

> We cannot agree with Brite that the plan was not proposed in good faith so as to bar its confirmation under 11 U.S.C. § 1129(a)(3) (1982). First, Brite's claim that the unsecured creditors' status was changed to effectuate the cram down does not go to whether the purpose of Sun Country's proposed plan is to reorganize or whether the plan has a reasonable hope of success. *Congress made the cram down available to debtors; use of it to carry out a reorganization cannot be bad faith.*

*Id.* at 408 (emphasis added).

The *Meadow Glen* court interpreted the *dicta* in *Sun Country* as implying that impairment where no impairment is necessary may bar confirmation. *Meadow Glen, Ltd.,* 87 B.R. at 425. If *Meadow Glen* means what Bank United says it means here, then it is simply wrong, for the Fifth Circuit ruled precisely to the contrary in its holding in *Sun Country,* on facts not essentially different than those presented in this case. *See Sun Country, supra.*

In point of fact, *Meadow Glen* is distinguishable in any event, for it is not a good faith case at all, but an unfair discrimination case. *Meadow Glen* is better understood as the logical extension of a long line of cases which deal with the propriety of separately classifying deficiency claims and trade debt, and which hold that there must be a legitimate reason independent of the bare desire to achieve confirmation in order to justify both separate classification and separate treatment of claims having similar legal priority against the estate's assets. *See, e.g., In re U.S. Truck Co., Inc.,* 800 F.2d 581 (6th Cir.1986); *In re AG Consultants Grain Division, Inc.,* 77 B.R. 665 (Bankr.N.D.Ill.1987); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819 (Bankr.

S.D.N.Y.1982). That, in fact, was the situation in *Meadow Glen.* An unsecured deficiency claim, held by the sole secured creditor in a single asset case, was placed in its own class while small unsecured trade creditors were placed in another class. *See In re Meadow Glen,* 87 B.R. at 426. The deficiency claim was to be given equity in the property, while the trade claims were to be paid in cash, though not in full on the date of confirmation; arguing from the *Sun Country dicta,* the *Meadow Glen* court noted the absence of any reason to justify the impairment of the trade debt other than to secure the acceptance of the plan, and concluded not that the plan was proposed in bad faith but that the disparate treatment was unfairly discriminatory, in violation of Section 1129(b). *Id.; see also In re Club Associates,* 107 B.R. 385, 401 (Bankr.N.D.Ga.1989) (citing *Meadow Glen;* alteration in status clearly intended only to create an impaired class to vote in favor of plan should not be allowed); *see also In re Greystone III Joint Venture,* 995 F.2d 1274, 1280–1281 (5th Cir.1992) (noting that, if creditors are to be separately classified, it makes sense that they also be treated differently), *cert. denied,* —— U.S. ——, ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992).

■■■■ Even if *Meadow Glen* is good law for the foregoing proposition (and reasonable minds could differ on this point),[37] its holding does not apply to the facts of this case, where unfair discrimination is simply not an issue. There is no unsecured deficiency claim receiving disparate treatment here, as there was in *Meadow Glen.* The debtor has simply elected to treat a certain class in a certain way, a treatment which has absolutely no impact whatsoever on the treatment of Bank United's claim. If the treatment was done "to effectuate the cram down" that fact "does not go to whether the purpose of [the Landing's] proposed plan is to reorganize or whether the plan has a reasonable hope of success." *See Sun Country,* 764 F.2d at 408.[38] Indeed, one has to question whether Bank United even has *standing* to complain about how another creditor class is treated under the plan, given that the treatment was evidently acceptable to that class. *See Matter of Century Glove, Inc.,* 1993 WL 239489 (D.Del. February 10, 1993).

■■■■ Assuming that the *dicta* in *Sun Country does* impose on the debtor an obligation to establish an independent basis for its impairment of a given class of creditors (and the court reiterates that, in its view, it does not), the Debtor's treatment of Class VII still passes muster. The Debtor notes that the Effective Date of the Plan is eleven (11) days after the confirmation order is entered, unless a stay pending appeal is granted. The Debtor will not know until the Effective Date whether the order granting confirmation will be appealed (although considering the past history of

---

**37.** Indeed, one of the teachings of *Greystone* is that *Meadow Glen* is wrong on this point. Separate classification of necessity means disparate treatment, else the rationale for a separate class is placed in doubt. The *Meadow Glen* court suggested that, to avoid a charge of unfair discrimination, a plan would have to give to creditors with otherwise similar legal entitlements virtually the same payment. But the statute itself only prohibits *unfair* discrimination, phraseology that can only have meaning if *some* discriminatory treatment might nonetheless be *fair.* One of the unfortunate twists in the *Greystone* saga is that debtor's counsel was relying on *Meadow Glen* in structuring the treatment of the classes he created under his plan. The Fifth Circuit then seized on the treatment to challenge the legitimacy of the classification scheme.

**38.** It is worth recalling that the precise issue of getting an impaired class to vote "yes" on the plan was before the court in *Sun Country:* "Brite argues that the final plan was not proposed in good faith because Sun Country changed the status of the unsecured creditors from unimpaired to impaired only so that they could approve the plan and effectuate the cram down." *Id.* The Fifth Circuit has already wrestled with this precise issue, and has declined the invitation suggested here by Bank United. The court's more recent pronouncement in *Matter of Greystone III Joint Venture* does not change the analysis, as that case is another classification case, along the lines of *Meadow Glen,* and is similarly distinguishable. *See Matter of Greystone III Joint Venture,* 995 F.2d 1274 (5th Cir. 1991), *cert. denied,* —— U.S. ——, ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992). The court in *Greystone* did not have occasion to, nor did it (nor could it, absent *en banc* review) reverse the holding of *Sun Country.*

this case, an appeal is likely). The Debtor persuasively argues that it should not be required to prepare to make payments to the unsecured creditors prior to the Effective Date. Moreover, the Plan provides the Debtor with sixty (60) days after the Effective Date to object to claims. The Debtor argues that this period to object to claims is especially necessary since MIRI has not been associated with the Debtor long enough to review all of these claims and may wish to object to them.

Delaying the payments slightly is also administratively convenient for the Debtor. In the ordinary course, it takes between two weeks and one month for bills to run through the Debtor's accounting system. Any attempt to pay these bills faster would require the Debtor's management company to draw its attention away from other regular duties, to the detriment of the smooth operation of the reorganized Debtor.

The class was impaired here due mainly to the replacement of the Debtor's general partner. Upon replacing CFC and Clark as general partners of the Debtor, MIRI became subject to the orders of this court which required strict compliance with the cash collateral budget, an accounting and repayment of cash collateral expenditures made in violation of prior orders, and the drafting and confirmation of this Plan in a specified, short period of time. Under MIRI's guidance, the Debtor has complied with the court's orders. As all of its efforts were placed toward monitoring cash collateral and drafting a confirmable plan, the Debtor's statement that MIRI needs more time to examine the trade claims is not untenable; certainly it is reasonable. Furthermore, the court agrees with the Debtor, that considering the past history of this case, Bank United will probably appeal this confirmation order, and the Debtor should not waste its precious few resources preparing to pay the trade debt before the Effective Date. The court finds that there were therefore legitimate factual reasons for the impairment here proposed. *See Sun Country*, 764 F.2d at 408; *see also Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1277 (5th Cir.1991), *cert.*

*denied*, —— U.S. ——, ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992). .

The artificial impairment objection is therefore rejected.

### 3. *Taxing of Bank United's Cash Collateral*

Bank United further objects on good faith grounds to the Plan provision which directs the Debtor's attorneys' fees to be paid out of Bank United's cash collateral, as a result of Bank United's bad faith, as well as any amounts paid by the Debtor which benefitted Bank United, specifically any portion of the 1992 *ad valorem* taxes which have not previously been approved for payment out of cash collateral. Bank United argues that neither of these attempts to tax its cash collateral are supported by statute or case law, and the debtor's attempt to accomplish either one via this plan demonstrates that the plan is not proposed in good faith.

#### a. Attorneys' fees

■ The Debtor suggests that it has incurred nearly $100,000.00 in attorneys' fees as a result of Bank United's bad faith vote under the Debtor's Fourth Amended Plan of Reorganization. The court designated Bank United's vote that time around, but refused to confirm the Debtor's plan because it failed to meet the "best interests of creditors" test under § 1129(a)(7)(A)(ii). The Debtor argues that, but for Bank United's bad faith vote, it could have modified the Plan pursuant to 11 U.S.C. § 1127. Shortly after the court denied confirmation, however, the Debtor's general partners, CFC and Clark, declared bankruptcy. The Debtor argues that the protracted litigation resulting from Bank United's bad faith vote caused the Debtor to miss its window of opportunity to get its plan confirmed since the insolvencies of its general partners occurred shortly after confirmation was denied.

The court will not award attorneys fees to the Debtor. True, Bank United did cast its vote in bad faith under the Fourth Amended Plan. But the Debtor's series of misfortunes cannot be blamed on Bank

United. Bank United did not draft the provision of the Debtor's plan seeking to pay its creditors less than they would receive in a liquidation; the Debtor did that, as imprudent as it ultimately proved to have been. Bank United did not cause the bankruptcies of CFC and Clark, either. Those misfortunes were brought about by other events.

Furthermore, as it turned out, there was no "window of opportunity" in point of fact, because the general partners ended up filing bankruptcy themselves and so would have been unable to perform the terms of the plan. Had the court *confirmed* the plan at that time, the property would today be in the hands of Bank United (in all likelihood), and the Debtor would no longer have the property with which to reorganize. The point of this exercise, after all, is not to "obtain confirmation," but to reorganize. The window of opportunity for reorganization is still open (perhaps in spite of Bank United) so the debtor can hardly complain that the bank closed it.

■ By the same token, however, denying the Debtor's request for attorneys' fees is not the same as finding that the request was made in bad faith, compelling denial of confirmation. The Debtor asserts that the court has the authority to award attorneys' fees in this case under its equitable powers, and cites *In re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr.W.D.Pa.1990) for the proposition that a court can grant equitable relief under § 105(a) where a creditor has cast its vote in bad faith. Although the Debtor's argument is novel and inventive, but ultimately wrong, it cannot be said that it was made in bad faith.[39]

b. *Ad valorem* taxes and corporate apartment costs

■ Bank United also contends that the Plan's provision seeking to tax Bank United's cash collateral for certain *ad valorem* taxes and expenses associated with the Debtor's "corporate apartment" program under 11 U.S.C. § 506(c) is in bad faith. Section 506(c) allows a Debtor–in–Possession to "recover from property securing an allowed secured claim the reasonable, and necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." The Fifth Circuit has noted that "[t]he underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs." *Matter of Senior–G & A Operating Co., Inc.*, 957 F.2d 1290, 1298 (5th Cir.1992).

Even under the Fifth Circuit's recent pronouncement in *Senior–G & A Operating Co.*, the facts of this case do not warrant the payment of all *ad valorem* taxes from Bank United's cash collateral. The court previously allowed the Debtor to reserve $93,564.00 for payment of *ad valorem* taxes out of Bank United's cash collateral. The final amount of such taxes for 1992 was $135,043.00. Thus, a shortfall of $41,479.00 resulted. The Debtor requested that it be authorized to pay the shortfall from Bank United's cash collateral. At the time of this request, Bank United and the Debtor were before the court disputing the Debtor's expenditures in excess of the cash collateral budget. The payment of taxes out of cash collateral at that time was done so that, in the event of a default, the Bank would not then have to pay these taxes. MIRI then agreed to repay to Bank United any expenditures in excess of the cash collateral order (which it eventually did). In addition, the court also ordered MIRI to pay any shortfall in *ad valorem* taxes not already covered by the funds in the escrow account. This was a condition to the Debtor's use of cash collateral. The Debtor did not appeal that order, and the court will not

---

**39.** Indeed, given the obstreperous conduct of Bank United, funded at the expense of the seemingly bottomless deep pocket of the federal government, the debtor can hardly be faulted for trying to recoup some of the fees *it* has had to incur fending off its litigious opponent. There are other avenues than section 105(a) however, and those routes ought to be explored instead. *See* 28 U.S.C. § 1927.

modify it now.[40] The Debtor's request is denied.

■ The Debtor's expenses under the "Corporate Apartment" program is a similar matter. The Debtor's "Corporate Apartment" program is a program whereby the Debtor offers furnished apartments to (usually) short-term residents. The expenses associated with the program stem from the need to furnish them, and the benefit is that they can be rented at a premium. The rentals from these apartments have become part of Bank United's cash collateral. While the court perceives the indirect benefit to the bank, competent evidence has not been presented to show that these expenses were in fact "reasonable, necessary costs and expenses of preserving, or disposing of ... property to the extent of any benefit to the holder of [the] claim" as required by the statute. Therefore, the Debtor has not met its burden of proof and may not tax these expenses against Bank United's cash collateral.

■ As the Plan provides for the court to make independent rulings upon the Debtor's theories of taxing Bank United's cash collateral, the Plan is not expressly conditioned upon such theories being approved, and the court's denial of payment of the "Corporate Apartment" program expenses and the *ad valorem* tax shortfall does not result in denial of confirmation. Both of the Debtor's requests to tax cash collateral under 11 U.S.C. § 506(c) are founded in both statute and case law, and cannot therefore, have been made in bad faith. In any event, their award was conditioned on court approval, *i.e.*, the Plan sought no more than the court was willing to award, *a fortiori*, this cannot be bad faith.

The court is satisfied that the plan has been proposed in good faith. Neither the law nor the facts warrant a finding that the plan was filed as anything other than a legitimate attempt to reorganize. The debtor has a reasonable chance of successful reorganization, as well. As a result the good faith standard of section 1129(a)(3) has been met. *Sun Country, supra.*

### c. § 1129(a)(5)

■ Under § 1129(a)(5) the plan proponent must disclose the identity of the individuals that will manage the business post-confirmation, and the participation of these individuals in the debtor's business must be consistent with the interests of creditors. *Id.*

■ In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors. *See In re Mortgage Investment Co.*, 111 B.R. 604, 612 (Bankr.W.D.Tex.1990). Bank United objects to MIRI's management of the Debtor on the grounds that MIRI has only been formed in the last year and has no proven track record for managing real estate.

While it is true that the entity "MIRI" has been in existence for less than a year, a closer look at MIRI's officers reveals them to be individuals who are well-versed in the management of distressed real estate. Mr. Bart McEntire, MIRI's President, has acted as tax counsel to a national real estate developer, has participated in syndication activities on some 150 commercial properties, and has negotiated real estate workouts for a major motel chain. MIRI's vice president, Mr. W.W. Miller, is the former head of real estate lending for a large Texas bank. MIRI's secretary, Mr. Brian Dorian, and its treasurer, Mr. Howard Akin, also have extensive experience with distressed real estate. In light of the vast experience of MIRI's officers with real estate management, Bank United's objection in this regard is not well taken.

Bank United further objects, however, arguing that MIRI's interest in the Debtor is inconsistent with its own. MIRI has invested in the Debtor in the anticipation of receiving a 30% internal rate of return on

---

**40.** In spite of the court's refusal to charge Bank United's cash collateral for the escrow shortfall, the court notes that the Debtor has little reason to complain as the cash collateral is still being tapped to pay $93,564.00 of the *ad valorem* taxes.

its investment (this rate of return is a target and is not contractually mandated). Bank United tries to paint a picture of an investor sapping all the Debtor's available cash flow and shuttling it up to its investors in New York City.[41] Bank United contends that MIRI will not be motivated to maintain the Apartments, and that, as a result, their condition will deteriorate over the life of the restructured debt, at the end of which MIRI can be expected to simply abandon the then run-down Apartments, leaving Bank United with severely devalued collateral to foreclose upon.

The record does not support the parade of horribles portrayed by Bank United. Certainly, MIRI wishes to reap a return on its investment, as did Clark and CFC. However, the officers of MIRI are sophisticated enough to realize that if the Apartments are not maintained, occupancy will drop (and with it, rental revenues), and considering the ready availability of quality apartment dwellings in San Antonio, MIRI could expect that drop in occupancy to occur rapidly. Simply put, MIRI must continue to invest money to make money. Testimony at the confirmation hearing supports MIRI's dedication to investing in the Debtor. In fact, MIRI has already advanced $40,000.00 to the Debtor, will provide an additional $250,000.00 upon confirmation, and another $200,000.00 within one year. It is unlikely that MIRI will suddenly walk away from the Debtor after investing this substantial sum of money up front. The court concludes therefore, that MIRI's post-petition management of the Debtor is not inconsistent with the interests of Bank United.

### d. § 1129(a)(7)

■■■ Before a plan may be confirmed in a case in which an impaired creditor has voted against the plan, the court must determine that such a creditor will receive under the plan at least what he would receive under a chapter 7 liquidation. *See In re Future Energy Corp.*, 83 B.R. 470, 489 (Bankr.S.D.Ohio 1988) (citing *In re*

*Western Real Estate Fund, Inc.*, 75 B.R. 580, 584 (Bankr.W.D.Okla.1987)). Section 1129(a)(7) provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

\* \* \* \* \* \*

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; ...

11 U.S.C. § 1129(a)(7)(A)(i), (ii). The plan proponent has the burden of proof in establishing that the best interests test has been met. *See In re Future Energy Corp.*, 83 B.R. 470, 489 (Bankr.S.D.Ohio 1988); *see also In re Neff*, 60 B.R. 448, 452 (Bankr. W.D.Tex.1985); *In re Featherworks Corp.*, 25 B.R. 634, 642–43 (Bankr.E.D.N.Y.1982).

■■■ Bank United, the rejecting impaired creditor, argues that it would fare better under a liquidation. The bank submits that it could immediately foreclose on its collateral and would not have to defend the current attacks on its cash collateral (discussed *supra* ). The Plan provides that Bank United will retain its lien on the real and personal property. The Plan further provides that the bank will receive monthly payments over a ten (10) year period, based on a thirty year amortization schedule, at eight and a half percent (8.5%) interest, or such other rate as the court determines up to eleven percent (11%). At the end of the ten year period, the Debtor will either make the balloon payment, sell the property (in which case the bank would also be paid off), or allow the bank to foreclose on

---

**41.** In essence, Bank United is adopting the "Pace Picante Sauce" defense, arguing that, where the only parties to benefit under a plan are New York City investors, and where their benefit will be at the (perceived) expense of a Texas bank, the court's response should be "Git a *rope*!"

the property.[42] The interest rate paid under the plan compensates the bank for the time value of money, as is necessary since the Plan stretches payments over a period of years. Clearly, Bank United is receiving the present value of its claim under the Plan. *See In re Johnson*, 101 B.R. 307 (Bankr.M.D.Fla.1989) (as long as creditor receives as much under plan as in liquidation, § 1129(a)(7)(A)(ii) is satisfied).

In fact, Bank United fares better under the Plan than it would in a liquidation. In its analysis, Bank United does not account for the costs it would incur to foreclose on the property (which would exceed several thousand dollars, given what its law firm has charged for legal services in this bankruptcy case to date). Bank United further ignores that it is likely to receive less for the sale of the Apartments under the "fire sale" conditions of a foreclosure than it would if the Debtor were to sell the Apartments under less stressful conditions on the open market. Nor is the court persuaded by Bank United's assertion that it would not have to defend its cash collateral from the Debtor's attempts to tax its cash collateral under 11 U.S.C. § 506(c). Causes of action under § 506(c) are equally available to Chapter 7 trustees in liquidations. Bank United would not avoid the § 506(c) attacks on its cash collateral merely by forcing the Debtor to liquidate. Therefore, the court concludes that Bank United fares at least as well (if not better) under this Plan as it would under a liquidation, and the objection, therefore, is overruled.

### e. § 1129(a)(11)

Section 1129(a)(11) requires that a plan be feasible in order to be confirmed, *i.e.*, that it will not be followed by liquidation or the need for further financial reorganization. A plan is feasible if it offers a reasonable assurance of success. *See In re Johns–Manville, Inc.*, 843 F.2d 636, 649 (2nd Cir.1988). "The feasibility test contemplates the probability of actual performance of the provisions of the plan, and whether the things to be done under the plan can be done as a practical matter under the facts. In determining feasibility, success need not be guaranteed, but the court must be satisfied that there is a reasonable prospect of a plan's success and that it is workable." *In re M & S Assoc., Ltd.*, 138 B.R. 845, 849 (Bankr.W.D.Tex. 1992) (citations omitted). In determining the feasibility of a plan, courts have considered other factors, including the adequacy of capital structure, the earning power of the business, the economic conditions of the debtor's business, the ability of management, and the probability of the continuation of management. *See, e.g., In re Mortgage Investment Company of El Paso, Texas*, 111 B.R. 604, 611 n. 8 (Bankr. W.D.Tex.1990).

While not entirely free of concern, the court can conclude with reasonable certainty that the Debtor has demonstrated the feasibility of the Plan. The Debtor's monthly operating reports reflect a strong, consistent growth in net operating income over the pendency of this chapter 11 case. The Debtor has paid nearly $2 million to Bank United in cash collateral, averaging nearly $43,000.00 per month. Under the terms of the Plan, the Debtor proposes to pay Bank United $39,000.00 a month, a substantially lower figure. As noted earlier, the Apartments are located less than two miles outside of Fort Sam Houston. It provides, by far, the most convenient off-base housing for the military personnel stationed on that post. Most other rental units are either too far away or too expensive to cater to the Fort Sam occupants. This unique location gives the Debtor a solid niche in the rental market for the area; a niche which promises high occupancy levels (and thus, revenues) for years to come. The Debtor's cash flow projections reflect this, indicating that it will be able to meet future debts as they come due. *See In re Nat'l. Awards Mfg., Inc.*, 35 B.R. 691 (Bankr.S.D.Ohio 1983).

The Plan proposes moderate growth in both income and expenditures. The Debt-

---

**42.** Representatives of the Debtor have repeatedly testified that they do not anticipate that the

bank will have to foreclose on the property.

**820**

or's provisions for maintenance of the property are not as substantial as one might like, but the court's concerns are offset by the Plan's provisions that MIRI will raise new capital to make capital improvements to the Apartments. This risk is no greater than that associated with any real estate partnership, in or out of bankruptcy, and MIRI appears well situated to accomplish that task, especially in view of its performance during the pendency of this case.

█ The court is further satisfied with the financial abilities of the Debtor's new general partner, MIRI. In addition to the significant capital contributions already made to the Debtor by MIRI, the Plan expressly requires MIRI to contribute $250,000.00 to the Debtor on the Effective Date [43] and another $200,000.00 on or before one year from the Effective Date.[44] These are reasonable provisions that more than adequately anticipate the risk of non-performance and afford creditors, including Bank United, adequate remedies in the event of default. No plan can offer certainty, and it is unreasonable for Bank United to expect it. What the plan does offer is a reasonable probability of success, and that is all the law requires the court to find under section 1129(a)(11).

█ Bank United contends that the balloon payment that comes due in year 10 of the Plan is *de facto* evidence that this reorganization will be followed by liquidation or further need for financial reorganization. The court does not agree. *See In re Club Associates*, 107 B.R. 385 (Bankr.N.D.Ga.1989) (nothing inherently infeasible about providing balloon payment in plan). Much testimony was offered at the confirmation hearing regarding the Debtor's intent with regard to its obligation to Bank United. The Debtor's representative testified that the Plan provided a ten (10) year payout so that the Debtor can explore refinancing or sale of the Apartments. Refinancing or sale does not mean "reorganization" or "liquidation" as those terms are used in the Bankruptcy Code; neither refinancing nor sale requires the filing of a bankruptcy petition or the submission of parties to the jurisdiction of a bankruptcy court. Rather, while the Debtor seeks out a buyer or new lender, Bank United's debt will be serviced under the provisions of the Plan, and, if properly maintained, the value of the property will in all likelihood not decrease. As the Apartments are, and historically have been, close to full occupancy, the Debtor should not have too much trouble selling or refinancing. *See In re Guilford Telecasters, Inc.*, 128 B.R. 622, 628 (Bankr.M.D.N.C.1991) (chapter 11 plan providing for balloon payment to debtor's major secured creditor was sufficiently feasible to be confirmed where future projections demonstrated that debtor could carry out financial commitments). This prospect should delight Bank United, who upon sale or refinance, would receive the present value of its claim and be rid of its relationship with the Debtor.

█ Bank United counters, however, that it is the length of the call which itself renders the plan unfeasible, as the debtor has little or no incentive to take any steps to resell the property in the early years of the restructured obligation, and the later in the term a sale is accomplished, the less likely Bank United is to realize enough out of the sale (or foreclosure, if no sale can be accomplished) to pay off the remaining debt. However, the court had competent testimony from MIRI representatives that it is in *their* best interests to realize a sale early rather than late in the term, in order to maximize the likelihood of delivering on their anticipated rate of return. A short call, however, would exert so much external pressure on an arm's length sale (in the form of a foreclosure waiting in the wings) that it would actually render the plan *less* feasible.

---

**43.** The Plan cannot be substantially consummated until MIRI unconditionally delivers the $250,000.00 to the Debtor.

**44.** Failure to unconditionally deliver the $200,-000.00 on or before one year after the Effective Date is a default under the Plan, allowing creditors to accelerate the maturity of their claims and exercise any available remedies.

The court is inclined to agree with the debtor and MIRI representatives, and rejects Bank United's arguments to the contrary. The plan's projections are reasonable, its prospects positive, and its management solid. The plan is feasible within the meaning of section 1129(a)(11).

### f.   § 1129(b)

■■ Notwithstanding the rejection of a plan by an impaired creditor, a court may confirm a plan, but only if the plan does not discriminate unfairly and is fair and equitable to the impaired creditor which has not accepted the plan. 11 U.S.C. § 1129(b)(1). Bank United contends that the Plan does not meet the requirements of § 1129(b).

### 1. *Fair and Equitable Treatment of Bank United's Secured Claim*

■■ Section 1129(b)(2)(A)(i) requires that, with respect to holders of secured claims, a plan, to be fair and equitable, must provide "that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." Simply put, the holder of an allowed secured claim must receive the present value of its claim on the effective date of the plan.

The Debtor has based its Plan upon an interest rate of 8.5%. The court believes that that interest rate is not inherently unreasonable, though the court elects a rate of 9.5% as more nearly reflective of a market rate, a course which the plan contemplates.

■■ "Cram down" is most analogous to a loan workout, and therefore, the rate on a similar loan to the one being sought by the Debtor ought to refer to a workout rate of interest. *In re Stratford Assoc., Ltd.*, 145 B.R. 689, 703 (Bankr. D.Kan.1992).[45] At confirmation, the Debtor presented evidence that the following interest rates are applicable to Bank United in this case:

| | |
|---|---|
| Guaranteed Yield under Assistance Agreement | 6.80% |
| Bank United's Cost of Funds for 5 Years or More | 6.84% |
| Prime Rate as of Confirmation Hearing | 6.00% |
| Rates at which Bank United has made new Apartment loans during the last 12 months | 7.00% to 8.84% |

These rates provide a touchstone for what is a reasonable rate of interest as between these two parties.[46]

To determine a reasonable rate of interest, other courts have approved rates determined by adding percentage points to the "riskless rate." *See, e.g., In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503, 1508 (9th Cir. 1987) (Treasury bill rate plus 1%); *United States v. Doud*, 869 F.2d 1144, 1146 (8th Cir.1989) (Treasury bond rate plus 2%); *In re Fowler*, 903 F.2d 694, 697 (9th Cir.1990) (prime rate plus risk factor); *In re 360*

---

**45.** As opposed to, for example, the rate the debtor might be able to obtain in the open market, for example, or the rate regularly offered to new borrowers. The evidence confirms that, in the current environment, *no* rate would be available to most debtors just emerging from bankruptcy (other than, perhaps, a blended rate consisting of, say 70% of the going lender rates plus 30% of an investor rate). And the debtor of course is not a "new borrower" either. It has been suggested that bankruptcy creates its *own* market, within which actors negotiate against the backdrop of risks and returns generated by bankruptcy itself. *See generally* M. MAC-DONALD, ET AL., CHAPTER 11 AS A DYNAMIC EVOLUTIONARY LEARNING PROCESS IN A MARKET WITH FUZZY VALUES, NORTON ANNUAL SURVEY OF BANKRUPTCY LAW (Clark Boardman Callaghan 1993). That observation conforms with the actual behavior of players in the bankruptcy arena. In fact, the outcomes in this "market" can actually be predicted, lending credence to the observation. *Id.*

**46.** Representatives of Bank United testified that the bank would not make this loan on terms similar to the provisions of the Plan. However, such testimony bears no probative value in determining an appropriate interest rate. *See Travelers Insurance Company v. Bullington*, 878 F.2d 354, 358 (11th Cir.1989).

*Inns, Ltd.,* 76 B.R. 573, 594 (Bankr. N.D.Tex.1987) (prime rate plus 2.5%).

As of the date of the confirmation hearing, the prime rate was 6.00%. The interest paid on ten year treasury bills was 6.67%. The addition of 1% to 2.5% to these rates approximates the 8.5% interest rate the Debtor offers under its Plan. An additional percentage point to offset risk permits the court to "sin on the side of grace," as it were. The economic strength of the Debtor has improved over the course of this bankruptcy. Moreover, the Debtor is backed by a strong general partner which has demonstrated during this case a commitment to recapitalizing and revitalizing the Debtor. Based on the above factors, the court concludes that a rate of 9.5% provides for an appropriate rate of interest to Bank United to provide the bank with the present value of its allowed secured claim.

## 2. *Unfair discrimination*

■ Bank United further contends that the Plan unfairly discriminates against it because it "artificially" impairs the Class VII claims, solely to gain the acceptance of an impaired class.

■ The argument is specious, however, because the unfair discrimination test is one applied to two classes of creditors, each of which have similar legal entitlements against the debtor. Unfair discrimination requires that a plan "allocate value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor." *In re Acequia, Inc.,* 787 F.2d 1352, 1364 (9th Cir.1986); *see* H.R.Rep. No. 595, 95th Cong., 1st Sess. 417–18 (1977). Bank United's complaint is aimed at the plan's treatment of *unsecured* creditors. Bank United holds only a *secured* claim. The two kinds of claims have entirely different legal entitlements against the estate's assets, so that

an unfair discrimination analysis is actually inapposite.

■ It is true that some courts have seemingly applied the unfair discrimination analysis to a plan's purported "artificial impairment" of a given class of creditors. *See, e.g., In re Club Assoc.,* 107 B.R. 385, 401 (Bankr.N.D.Ga.1989) ("[a]n alteration which is clearly intended only to create an impaired class to vote in favor of a plan so that a debtor can effectuate a cramdown ... will not be allowed"); *see also In re Meadow Glen, Ltd,* 87 B.R. 421, 427 (Bankr.W.D.Tex.1988).[47] To the extent they have done so, however, these authorities must be rejected. The proper analysis of so-called "artificial impairment" is to be conducted under the rubric of the plan's *bona fides* under section 1129(a)(3), as was done here in this opinion. Admixing the notion with "unfair discrimination" only tends to introduce further confusion into an already confused body of law. The test is not, after all, whether the plan is generally *unfair,* but whether the plan's treatment of a particular class is unfairly *discriminatory vis-a-vis* similarly situated classes of creditors.

■ Bank United also complains that the Plan unfairly discriminates against it because the Class VIII unsecured claims will be paid within 38 months, while the Bank United secured claim will not be paid in full for at least ten (10) years (employing a thirty year amortization schedule). Again, this argument misunderstands the notion of unfair discrimination. Discrimination, by its very nature, indicates that *similar* claims are being treated differently. *Acequia,* 787 F.2d at 1364. Here, the secured claim of Bank United and the unsecured claims of the Class VIII creditors are not similar; the nature of the respective creditor groups' claims against the Debtor differ. To compare the treatment of a secured claim with that of an unsecured claim is like comparing apples to oranges:

---

**47.** A closer reading of *Meadow Glen* confirms that that court did *not* in fact admix the two concepts, though that is the position advanced here by Bank United. That court did not purport to locate the notion of "artificial impairment" in any one provision of section 1129.

 

you just cannot do it and reach a meaningful conclusion.[48]

It is exactly because the nature of the claims differ that they *may* be treated differently under the Plan. Bank United's secured claim originates from the mortgage obligation owed to it by the Debtor. It is not uncommon, as proposed under the Plan, to pay a mortgage under an extended term, even while trade debt is being paid over a shorter term. Certainly, banks and borrowers enter into such lengthy loan relationships outside of bankruptcy every day. If mortgages were not available, purchasers could never amass enough cash to buy anything of substance. If the repayment of mortgages were not over an extended period, a borrower could rarely generate enough income to meet its debt service. Mortgage lenders do not *expect* to get paid any sooner than the mortgage provides, and borrowers, likewise, do not *expect* to have to pay any sooner.

In contrast, the Class VIII claims are unsecured claims, incurred by the Debtor in its everyday business operations. Such debts, usually referred to as "current liabilities," are expected to be paid within at least a month, and usually never more than a year. They are even treated differently for accounting purposes.

▄▄▄ Long-term obligations are thus different from short-term obligations. The expectations of the parties entering into these different transaction vary with the nature of the transaction. Clearly, it cannot be "unfair discrimination" for a plan to provide a long-term payout to a long-term obligation and to provide a short-term payout to a short-term obligation. Thus, the treatment of obligations consistent with their natures cannot be "unfair discrimination."

Accordingly, the court finds that the plan is fair and equitable and does not unfairly discriminate against the claim of Bank United, and therefore satisfies the requirements of 11 U.S.C. § 1129(b).

## CONCLUSION

For the reasons stated herein, the court will confirm the Debtor's Plan of Reorganization Dated December 23, 1992, as Modified. Separate orders consistent with this decision will be entered.

48. Just because we eat the skin of an apple, does that mean we also have to eat the skin of an orange? Or *vice-versa?*